LOCAL No. 802 *v.* ASIMOS.

4-9061                            227 S. W. 2d 154

Opinion delivered February 20, 1950.

Rehearing denied March 20, 1950.

*George F. Edwardes,* for appellant.

*Shaver, Stewart & Jones,* for appellee.

ED. F. McFADDIN, Justice. The Miller Chancery Court, on petition of appellees, permanently enjoined appellants from picketing appellees' restaurant; and this appeal seeks a dissolution of the injunction.

Appellees Asimos and Scott are partners, operating the Jefferson Coffee Shop in Texarkana, Arkansas. It is located at the corner of Front Street and State Line Avenue, with an entrance on each street. Thirty-four persons are employed in the Coffee Shop, which is open twenty-four hours of each day. The business is entirely intra-state, and no question of inter-state commerce arises in this case. Appellant, Local No. 802 of the Hotel and Restaurant Employees and Bartenders Union, (an affiliate of the American Federation of Labor) is a Union for waitresses of any and all restaurants in Texarkana, Arkansas-Texas. In addition to the Local No. 802, other appellants include the officers of the said local. For convenience, we will hereinafter refer to the appellees as "Jefferson" or ""Coffee Shop", and to the appellants, either individually or collectively, as the "Union".

In 1927 Jefferson had a contract with either the present Union or some predecessor local; and again in 1942 Jefferson bargained with the Union. The failure to continue the bargaining in each instance seems to have been due to the inability of the Union to hold its members. A few weeks prior to May 3, 1949, an officer of the Union asked Jefferson to sign a contract with the Union as the bargaining agent of Jefferson's em-

ployees. Only one Jefferson employee was a member in good standing of the Union. Six or eight other employees, in months or years previous, either had joined, or signed application cards to join, but had abandoned the affiliation.

Jefferson discussed the Union request with some of its employees and was told that few of them had any desire to make the Union the bargaining agent. The employees were satisfied with their working conditions. Jefferson conveyed this information to the Union and was advised that ". . . if Jefferson did not recognize the Union, the Jefferson employees would be called out". The Union official reported Jefferson's attitude to a regular meeting of Local No. 802, and it was voted to call a strike of Jefferson's employees and to establish a picket line in front of the Coffee Shop, in order to enforce collective bargaining by Jefferson with the Union.

At 1:00 a. m., May 3, 1949, the Union established a picket line on the sidewalk in front of the Jefferson Coffee Shop. There were two pickets: one girl walked slowly in front of each of the doors of the Coffee Shop; and each girl carried a placard reading: "Jefferson Coffee Shop Refuses to Bargain with Employees' Local 802". As soon as the picketing commenced, three or four employees of Jefferson left their work. Several employees refused to return to work, either because they were frightened by the assembled crowd, or because they had relatives in some Union and were reluctant to cross the picket line.

About thirty minutes after the picket line had been established, a man named Murphy entered the Coffee Shop as a patron, and, after being served with food, went out on the sidewalk, where a group of twenty-five or thirty people had assembled. Murphy gives this version: A man named Pruitt made the remark, "Anybody who goes in there and eats is a dirty scab"; that after other words of like import, Murphy struck Pruitt, and a fight ensued; and that officers quickly took both men in custody. Pruit gives this version: He was employed as

floor manager at Chaylors Night Club and had an argument with Murphy at that place earlier in the evening; that when Murphy saw Pruitt at the Coffee Shop, they renewed their previous quarrel, which was in no wise connected with the picketing. Although Murphy denied ever having seen Pruitt before the Coffee Shop difficulty, he did admit having been to Chaylors Night Club about two months prior to the Coffee Shop encounter; and Murphy's pugilistic instinct and willingness to engage in an affray is reflected by the following question and answer on cross-examination:

"Q. Mr. Witness, what are you smiling about?

A. Mr. Lawyer, I was thinking about how I would like to punch you in the nose."

In addition to the facts previously detailed, the evidence further showed (1) that the Murphy-Pruitt fight was the sole act of violence occurring during the entire time of the picketing; (2) that at several times a crowd—actuated by curiosity and estimated from twenty-five to a hundred—gathered on the sidewalk in front of the Coffee Shop; (3) that there was no mass picketing (being only one picket at each door); (4) that sometimes a picket would walk so close to the door of the Coffee Shop that a patron would be impeded in entering; and (5) that because of the picketing the volume of business of the Coffee Shop materially decreased, and the appellees suffered financial loss.

The picketing began at 1:00 a. m. on May 3 and continued until 5:30 p. m. on May 5, at which time the Chancery Court granted a temporary restraining order against all picketing. On June 17 the temporary order was made permanent in the injunction decree (here challenged) which reads in part as follows:

"IT IS THEREFORE by the Court considered, ordered and adjudged that the defendants and each of them be and they are hereby permanently and forever restrained, enjoined and prohibited from in any manner interfering with the employees of the plaintiffs and from in any manner interfering with any person who

may desire to enter the employ of plaintiffs by way of threats, personal violence, intimidation or ·other means calculated or intended to prevent such person or persons from entering or continuing in the employ of plaintiffs or calculated or intended to induce any such person or persons to leave the employ of the plaintiffs; from picketing plaintiffs' place of business and from patroling the abutting sidewalks or boycotting plaintiffs' business by the display of placards, distributing circulars, handbills or otherwise; from interfering, intimidating, boycotting, molesting or threatening in any manner the patrons or prospective patrons of plaintiffs or other person or persons seeking to enter plaintiffs' place of business; from congregating or loitering about and congregating on the sidewalks or streets abutting plaintiffs' place of business, or at other places, with intent to interfere with the employees of plaintiffs with intent to cause them to leave the employ of plaintiffs or to interfere with or obstruct plaintiffs' place of business in any manner, or induce the public not to deal with plaintiffs; from interfering with the free access of employees and patrons to and from plaintiffs' place of business and from obstructing the sidewalk in front of plaintiffs' place of business; from giving any directions or orders to individuals, committees, associations or otherwise, for the performance of any such acts or threats which would in any manner impede, obstruct or interfere with the regular operation and conduct of plaintiffs' business.''

So much for the statement of the case. The appellant (Union and its officers) claims that the injunction decree violates the right of free speech guaranteed under the Fourteenth Amendment of the Federal Constitution. This contention, made in the lower court and reiterated here, presents the Federal question on which our opinion must necessarily be based.

We have decisions of our own in which permanent injunctions were granted against picketing. These cases are: Local v. Stathakis, 135 Ark. 86, 205 S. W. 450, 6 A. L. R. 894; Riggs v. Tucker Duck & Rubber Company, 196 Ark. 571, 119 S. W. 2d 507; and Local v. Jiannas, 211

Ark. 352, 200 S. W. 2d 763.[1] Each of these opinions was written by that outstanding jurist, Mr. Justice FRANK G. SMITH, who recently retired from this court after thirty-seven years of service. The opinions in these three cases have charted the course of our jurisprudence on the questions involved: but in each of these cases the injunction was upheld because there had been law violations and repeated acts of violence. The Supreme Court of the United States has recognized in *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552, 132 A. L. R. 1200, that an injunction prohibiting picketing is justified where there is a background of law violation and acts of violence.

In addition to our own opinions, as previously mentioned, there are certain United States Supreme Court cases which involve the right of free speech as intertwined with picketing cases. Some of these are:

*Senn* v. *Tile Layers Union,* 301 U. S. 468, 81 L. Ed. 1229, 57 S. Ct. 857; *Thornhill* v. *Alabama,* 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736; *Milk Wagon Drivers Union* v. *Meadowmoor Dairies* (called ''the Meadowmoor case''), 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552, 132 A. L. R. 1200; *American Federation of Labor* v. *Swing,* 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568; *Bakery and Pastry Drivers Local* v. *Wohl* (called ''the Bakery case''), 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816; *Cafeteria Employees Union* v. *Angelos* (called ''the Cafeteria case''), 320 U. S. 293, 88 L. Ed. 58, 64 S. Ct. 126; *Lincoln Federal Labor Union* v. *Northwestern Iron Company* and *Whitaker* v. *North Carolina,* 335 U. S. 525, 69 S. Ct. 251; *Giboney* v. *Empire Storage Co.,* 336 U. S. 490, 69 S. Ct. 684.

A careful study of these cases has led us to the conclusion herein to be stated. In considering any case involving a right claimed under the Federal Constitution, we must necessarily be guided by the decisions of the United States Supreme Court construing such constitutional provision because, as observed by Mr. Justice

[1] In 1 Arkansas Law Review 281, there is an article entitled "Injunction Against Picketing in Arkansas."

McHaney, in *Berry* v. *City of Hope*, 205 Ark. 1105, 172 S. W. 2d 922,

". . . still the Supreme Court of the United States is the final arbiter of the construction to be given that document which all of us are sworn to support, and we must follow the majority view as expressed in said cases."

Here the picketing done by the Union is claimed to be protected by the right of free speech, as guaranteed by the Fourteenth Amendment to the United States Constitution.

That the injunction granted by the Miller Chancery Court is extremely broad and far-reaching, is readily apparent from a reading of it, as heretofore copied. That the Supreme Court of the United States has upheld picketing in cases similar to the one at bar, is likewise readily apparent from a reading of the cases of that Court, as heretofore cited. Therefore, in the light of the Federal cases, appellees' learned counsel, in the brief, and in the oral argument, sought to defend the broad language of the injunction on the three grounds which we now mention:

1. Appellees claim that there had been law violations and acts of violence at the picket line. If the picketing had resulted in violence, unlawful acts, or breaches of the peace, then the case at bar would fall within the rule of our own decisions in the Stathakis case,[2] the Riggs case,[3] and the Jiannas case,[4] and the injunction against the picketing would find Federal approval in the Meadowmoor Dairy case, *supra*. But here we find only one act of violence—i. e. the Murphy-Pruitt fight—and we are not convinced that it grew out of the picketing. At most, it was an isolated instance. Neither was there mass picketing, so as to block access to the Coffee Shop. The fact that the two pickets walked near the doors, and at times impeded entrance, is a matter that will be subsequently mentioned as susceptible to specific in-

[2] 135 Ark. 86, 205 S. W. 450, 6 A. L. R. 894.
[3] 196 Ark. 571, 119 S. W. 2d 507.
[4] 211 Ark. 352, 200 S. W. 2d 763.

junction; but certainly those acts are not sufficient to justify a permanent injunction against all picketing. The fact that a crowd of from twenty-five to one hundred people—actuated by curiosity—gathered on the sidewalk outside the Coffee Shop, is not alone sufficient to justify a permanent injunction: the Coffee Shop was located near the railroad station and the bus terminal, where travelers are expected to come and go. There is nothing to show that the crowd was disorderly or engaged in any violence. In short, the facts in the case at bar do not bring it within the rule of our own cases previously mentioned, or the Meadowmoor Dairy case from the United States Supreme Court.

II. Appellees claim, to quote from their own brief, ". . . the picketing was unlawful in that it had an unlawful objective—the coercion of the execution of a closed-shop contract proscribed by statute law." Amendment No. 34 to the Arkansas Constitution provides:

"Section 1. No person shall be denied employment because of membership in or affiliation with or resignation from a labor union, or because of refusal to join or affiliate with a labor union; nor shall any corporation or individual or association of any kind enter into any contract, written or oral, to exclude from employment members of a labor union or persons who refuse to join a labor union, or because of resignation from a labor union; nor shall any person against his will be compelled to pay dues to any labor organization as a prerequisite to or condition of employment.

"Section 2. The General Assembly shall have power to enforce this article by appropriate legislation."

Acting under this Amendment, the General Assembly adopted Act 101 of 1947 (See § 81-201, *et seq.* Ark. Stats. 1947) which provides, *inter alia,*

". . . no person . . . firm . . . or labor organization shall enter into any contract to exclude from employment . . . persons who are not members of, or who fail or refuse to join, or affiliate with, a labor union . . ."

In *Lincoln Federal Labor Union* v. *Northwest Iron Company,* and in *Whitaker* v. *North Carolina,* 335 U. S. 525, 69 S. Ct. 251, the United States Supreme Court on January 3, 1949, upheld the constitutionality of a Nebraska constitutional amendment, and also a North Carolina statute, each similar to our amendment and statute just quoted. In *Giboney* v. *Empire Storage Company,* 336 U. S. 490, 69 S. Ct. 684, the United States Supreme Court on April 4, 1949, affirmed a judgment that enjoined picketing which had as its purpose the violation of a State law. On the authority of these Federal cases the injunction in the case at bar could be sustained in some form, if the appellees had shown that the Union was picketing the Jefferson Coffee Shop in an effort to compel the execution of a ''closed-shop'' contract. There was an allegation to such effect in the complaint, but a denial of it in the answer.

A careful search of the entire record fails to disclose a single line of testimony by anyone to the effect that a closed-shop contract was ever mentioned, or demanded by the Union, or any of its officials, in any of the conversations with the appellees concerning the Jefferson Coffee Shop. So, in the absence of all such evidence, we cannot hold that the picketing in the case at bar had anything to do with a closed-shop contract. In short, the injunction cannot be upheld on appellees' second contention.

III. Finally, appellees seek to uphold the injunction by this contention:

''Because no labor dispute existed between appellees and their employees, and there was in progress no strike which might have justified peaceful picketing.''

Appellees are correct in stating the fact that no labor dispute existed between the Jefferson Coffee Shop and its employees. The record clearly shows that only one Jefferson employee was in good standing in the union, and the other Jefferson employees did not desire to join. The absence of a labor dispute—in the sense that the term is ordinarily used—was a fact that apparently

weighed most heavily with the learned Chancellor in granting the injunction because in his opinion he made these observations:

"We have a situation here where a group of people operate a restaurant and it seems to have been operated very peacefully. Nobody connected with the restaurant as an employee or as an owner was having any trouble between themselves. They were getting along all right. . . . I don't understand the law to be that if a man or company and all its employees are peacefully working together that any particular person or individual connected with any organization has any right to go down and demand that the people that work in there or the people operating it shall or shall not be connected with the union. . . . I just don't believe the law ever was intended for any group of men to come in and say, 'You are either going to join the union and bargain so that we can regulate prices and conditions of labor or we will close your place of business.' That doesn't sound right to me."

Thus, the learned Chancellor was evidently of the opinion that until the employees went on strike, there could be no picketing; and that in the absence of a labor dispute, the Union had no right to establish a picket line. In this view the Chancellor was probably following the text found in 31 Am. Jur. 950 in the Topic, "Labor," § 236:

". . . picketing by union, in the absence of any dispute between an employer and his employees, is unlawful where the purpose is to compel the employer to contract with the union, to adopt the hours of work and scale of wages favored by the union, to recognize the union, . . ."

There is nothing in the record to show that the attention of the Chancellor was ever called to either of the two United States Supreme Court cases now to be discussed. As heretofore observed, we are under oath to obey the United States Constitution; and the interpretation of that document, as made by the United States Supreme Court, is binding on us. That tribunal has decided that

there may be picketing in the entire absence of a labor dispute.

In *Bakery and Pastry Drivers* v. *Wohl,* 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816, there were some peddlers of bakery products, each of whom drove his own vehicle and solely operated his own business, and employed no helper. The Union undertook to compel these peddlers to work only six days a week and employ a Union driver for the seventh day. In order to accomplish its purpose, the Union picketed the bakery from which the peddlers bought their products, and picketed the vehicles in which the peddlers delivered products to the patrons. The peddlers did not belong to the Union, and did not want to join the Union, or make a contract with it. Yet the Supreme Court of the United States upheld the Union's right to picket, as herein stated; and this decision was based on the right of freedom of speech guaranteed by the Fourteenth Amendment. The majority opinion of the United States Supreme Court contains this language:

"We ourselves can perceive no substantial evil of such magnitude as to make a limit to the right of free speech which the petitioners sought to exercise."

In other words, the Union was allowed to do the picketing in this case, under the claimed right of freedom of speech, because there was no mass picketing, there were no acts of violence, and there were no breaches of the peace connected with such picketing.

Again, in *Cafeteria Employees* v. *Angelos,* 320 U. S. 293, 88 L. Ed. 58, 64 S. Ct. 126, Angelos and other partners owned and operated a cafeteria, conducting the business without the aid of any employees. The Labor Union picketed the cafeteria in an attempt to organize it. The picketing was done by the parading of one person at a time in front of the premises, and carrying a sign which gave the impression that the cafeteria was unfair to organized labor. Angelos obtained an injunction in the State Court against such picketing. Certainly there was no labor dispute based on existing or past transactions because Angelos and his partners had no em-

ployees. Yet the Supreme Court of the United States, after pointing out that there was no mass picketing, and that there had been no acts of violence in connection with the picketing, upheld the union's right to engage in such picketing on the grounds of freedom of speech guaranteed by the Fourteenth Amendment of the United States Constitution.

The Bakery case and the Cafeteria case, just discussed, are cases that rule here. In the case at bar there was an absence of violence, law violations, or breaches of the peace (growing directly out of the picketing); there was no mass picketing; the signs carried by the pickets were not libelous or false; there is no proof that there was a demand for a closed-shop. In short, there is no fact present in the case at bar to distinguish it from the Bakery case and the Cafeteria case, just discussed, so we must hold that there can be peaceful picketing [5] even in the absence of a labor dispute relating to persons presently employed; and we must dissolve in part the injunction granted by the Chancery Court.

## CONCLUSION

There is one item in the injunction that must be sustained, and that relates to the action of one of the two pickets in walking so near the entrance of the Coffee Shop that the patrons were hindered from entering. Under the facts in this case, and due to the location of the Coffee Shop, and the width and use of the sidewalk, we hold that neither of the two pickets should have been allowed to approach at any time nearer to the entrance of the Coffee Shop than the outer edge of the sidewalk. We modify the injunction to prevent any picket from approaching nearer to any entrance of the Coffee Shop than the outer edge of the sidewalk. In all other respects the injunction must be dissolved.

The decree of the Chancery Court is reversed, and the cause is remanded with directions to proceed in a manner not inconsistent with this opinion.

[5] For Annotations on various phases of picketing, see these: 132 A. L. R. 1218, 137 A. L. R. 1108, 147 A. L. R. 1076, 2 A. L. R. 2d 1196. For Law Review articles, see 56 Harvard Law Review 180, 513, 532. Also 41 Michigan Law Review 1037 and 42 Michigan Law Review 706.